to next case. Stone v. High Mountain Mining Company, 22-1340. And each side will have 20 minutes, but each side has given four minutes. Maybe I should wait until everyone. My understanding is each side is relinquishing four minutes for supportive amicus arguments. Is that correct? So even though the side has 20 minutes, we're going to show, you're going to be getting a red light at 16 minutes. If you want to relinquish time earlier, fine. But pay attention to the 16 minutes, okay? I appreciate the explanation. You may please the court. My name is Josh McMahon, and I represent the appellant, High Mountain Mining Company, LLC. With me at counsel table is Gabe Racks on behalf of the amici who will be doing the argument at the court, just for reference. This case is a case of first impression for this court. It's about whether the 10th Circuit will expand the jurisdiction of the Clean Water Act. Since the time claims filed this lawsuit in 2019, the Supreme Court's issued two decisions scaling back the act's jurisdiction. The first one is discussed at length in the brief. That's the Maui case. That was actually decided almost exactly a year after this case was filed. The second one is from just this past May. That's a sack at the EPA. In both cases, the Supreme Court highlights the fact that the act leaves substantial responsibility and autonomy to the states to address things like non-point source pollution and groundwater pollution. Those are the types of alleged pollution at issue in this case. Justice Alito in the Sackey case, he explained that an overly broad interpretation of the act would impinge on the state's primary authority to prevent, reduce, and eliminate pollution. High Mountain worked with the state of Colorado at all times relevant and had a permit to operate its mine. However, following the district court's judgment, High Mountain has surprise liability. The thin factual record here implicates federal jurisdiction. There has to be a meaningful burden of proof for plaintiffs. If not, that's contrary to Maui because it greatly expands the reach of the Clean Water Act right after the Supreme Court's told us we're scaling back that jurisdiction. If the court allows a plaintiff to prevail on the thin record where they haven't met the burden of proof, the case law going forward in the 10th Circuit is going to be chaotic. That's going to be because this court won't be following the Maui decision and it's going to result again in surprise liability for operators just like High Mountain. The court has the prime opportunity now to explain that at least in the 10th Circuit, plaintiffs are going to have to comply with the Supreme Court. The plaintiff's burden here was preponderance of the evidence, right? That's right. Court found it had met that burden of proof and it's up here now on clear air for us to reverse that finding. Aren't we just in our traditional evidentiary post-trial framework here? Sort of, but where we're going is you have to go back to the beginning. Maui articulated a number of factors, but before we even get to those factors, we have to talk about what the Clean Water Act itself just requires. You have to show the addition of a pollutant to an added water. That's the discharge. That's the definition, right? You have to show that addition. That's the federal statutory requirement, right? That's right. There's no evidence in this case that a pollutant was actually added to the river. There's not even evidence in this case that it's actually been conceded during trial. There's not even evidence of a molecule of water leaving the mine and going to the river, let alone a pollutant. If I can interrupt you there, how does that point implicate the jurisdictional point that you're making? That's confusing to me. Because if we're not going to require plaintiffs to show the addition of a pollutant to a river, all of a sudden, the Clean Water Act scope is gigantic. Now you have to get permits when you don't even have to show a pollutant's been added to the river? They would turn the Clean Water Act on its head, but that's exactly what the district... The problem here is really a failure of proof. That's the fundamental problem. There's no proof. Fundamental, that's right. To even trigger the Clean Water Act jurisdiction, you have to show the addition of a pollutant to the river, and there's no evidence of that here. But you went a little further just now, and I'm not sure that's supported by the record. You said there's no evidence that any water left Pond 3 and entered the water, entered the river. Is that right? Is that what you're saying? That's right. There's no evidence in this case that a molecule of water left the mine and entered the river. That's right, Your Honor. And that was repeated by the experts conceded at that point. There was evidence, even a concession from your expert, as I recall, that there was leakage through the bottom of the ponds, leakage of water. Is that wrong? Yes, Your Honor. And I believe you're talking about Mr. Lewicki's testimony. Well, but even if he didn't concede, there was evidence from the plaintiffs, was there not? No, Your Honor. There's no evidence that water left. What they provided were surface-level radar studies. They shot radar into the ground and made some assumptions about what they were seeing there. But there were no situations... Well, that's what scientists do, isn't it? Well, in a way. But let's say, for example, let's assume that even... And that's Mr. Searle's study. Let's say his study did show that a molecule of water was actually leaving the ponds. It's not a Clean Water Act violation. I want to test you on whether... I mean, if you're right that there's no evidence that any water left the pond, then you win. And we don't have to worry about these other things. So I'd like to see how supported that proposition is. Because didn't the mine even have disclosures to the government saying that there would be leakage, that some of the water was supposed to enter the ground through the bottom of the pond? Didn't they say that? So I think you're conflating the same idea that the district court judge did. So what the permits allowed High Mountain to do was have these clay-lined ponds that water could infiltrate into the ground, is what the permits said, or evaporate. But we need to be careful. It's not enough that water could leave ponds three or four. What you have to actually have is the water then, according to Maui, go through the groundwater and actually get to the river. Okay, but that's the second step. First, it has to get into the ground. Are you conceding that it got into the ground, through the bottom of the pond, that some water got through the bottom of the pond? Your Honor, I don't believe there's any evidence of that. Instead, there's a snapshot in time. Okay, but didn't the mine concede that in filings and documents submitted to the government? That it wasn't impermeable to water? No, what it said is the, well, impermeable, I would agree, Your Honor. There is nothing in the permit document that would say it's impermeable, but I think it's important to understand that the state of Colorado, when you have these clay-lined ponds, they're not going to be impermeable. Okay, so some water gets through the bottom. Some infiltration, what they would say, would be inevitable. That's right, but that's not a Clean Water Act violation. But you said not a drop got out of the pond. That's what you were saying a minute ago. Now, I think you're at the point where you have to say there's no evidence that it got from the ground below the pond into the river. And I apologize, Your Honor, I thought that's what I had said earlier. Because it's not enough that it just leaves the pond. I thought you said both. And if we're going to the second one, and you're one molecule, and whether that one molecule makes it to the river, obviously nobody can measure whether one molecule made it. What would be a satisfactory level of proof for you? You'd say, looks like they proved it. Are you talking about die-cast or something like that? That would be a way to prove it. But in terms of a sufficient amount of proof, I think you have to show some kind of measurement. Again, and that's why the Supreme Court articulated all those factors. Don't leave me hanging with some kind. You're in here saying that the district court, who had a very detailed, thorough order, needs reverse for lack of sufficient evidence. And my question to you is, what would have been sufficient evidence that you would say, sorry, we filed our appeal, looks like there's a sufficient evidence, even though we disagree with it? I think there would have to be some water quality sampling, both at the mine and in the river. And what we had here was one day, 2016, three years before the lawsuit was filed. We have water sampling at just one point in Pond 4, one point in the river next to Pond 4, and another point upstream. I think that's far insufficient to show that a pollutant was actually added from the pond to the river. Instead, what the plaintiffs were trying to prove, really, was the fairly traceable test that the Supreme Court rejected in the Maui case. But we don't even get to the fairly traceable test because, again, I don't think there's evidence that a pollutant was actually added to the river. And Judge Timkovich noted we had the Sierra Club, the El Paso gold mines case, right? All the water going through the tunnel. And you noted in that case that, okay, they can show that water's in the tunnel, and the water's actually getting to a navigable water at the end. And you cautioned the parties, and you said, that's not enough. The plaintiff has to prove the pollutant was actually added. Yeah, I think that's right. Doesn't the Johnson testimony and report establish a hydrologic connection between the pond and the Middle Fork? Which, I apologize? Johnson's testimony, doesn't that establish a hydrologic connection? I believe you're talking about Ms. Johnson's testimony that was introduced for the first time, or actually disclosed for the first time during the plaintiff's rebuttal case. Right. And what she was trying to do was satisfy one of the Maui factors, right? The Supreme Court told us time and distance are going to be most important. And plaintiffs have never disclosed prior to trial. What about the substance of it? We can get to the procedural issue of whether she should be allowed to testify if you want to pursue that. But what about the substance of her testimony? No, it's basically... Go ahead. She gave an expert opinion that given the nature of the subsurface there, any water that infiltrated from the pond would reach the river within a couple days. Why was that not admissible expert testimony upon which the district court could rely? As I mentioned a minute ago, it was never disclosed prior to trial. That's the procedural issue. If you want to address that, we can get to that. In terms of the substance, I apologize, Your Honor, I didn't mean to speak over you. So she purported to apply something called Darcy's Law. I'll tell you, I still don't know what Darcy's Law is. It's not in the record. Apparently, it's some kind of mathematical equation. Mr. Lewick, you knew. He'd used it before, right? That's right. But again, in the record, there's no evidence of what it is. Apparently, it's an equation, and you take measurements from what's in the ground. And the party opposing the expert can challenge the testimony by looking into the basis of the opinion. But the opinion itself was admissible. It wasn't based on actual measurements. I believe that the measurements were based on... She assumed the nature of the rocks and other material below the surface. I disagree with that. I believe what the record reflects is what Johnson and Lewicki were testifying about was what they find around the ponds when you're walking around. They said they find cobbles. You can pick them up. There's clearly sand and things like that. But nobody knows for certain what's in the ground. And so she took these measurements from what folks knew were on the surface, assumed that's what's in the ground. But don't forget, Darcy's Law apparently also requires measurements for what's the angle from point A and point B. We don't even know where point A is. She was more favorable than Mr. Murphy was on the substances as far as permeability. No, I would disagree. There wasn't evidence about what's actually in the ground. The evidence was what's on the surface. But there's no allegation here that the water's being discharged over the surface. The allegation here is that water is somehow going through the ponds, contacting groundwater, which there's no evidence of where there's groundwater, and then getting transferred to the river. We're really talking about standards review, right? You're making a case as though we get to substitute ourselves for the district court. But the district court made fact findings, and the district court made credibility findings that you don't like. I understand that. But that doesn't free us to have a different standard of review. In other words, on these sorts of things, did one molecule, so forth, the district court tracked through it, gave us reasons, relied on testimony, pointed to this and that. And at the end of the day, we may say we would have determined that differently. But that doesn't mean we reverse. And what I'm getting from you is an argument saying the district court got it wrong, and here's why. Not really dealing with the standards of review. I don't necessarily believe that's the case, because again, we have to get back to, the only way you trigger the federal court's jurisdiction here under the Clean Water Act is to show that a pollutant was added. And I don't believe the district court, there's findings that he made that water left the ponds, and he believed that there was a pathway, and somehow that it got to the river. But there's no evidence of a pollutant. That's an important distinction. But you seem to be saying that there wasn't sufficient evidence for him to find a pathway for water to go there. That's what I'm pursuing with you. They're two different things. But you seem to be attacking the first point. You're saying, contrary to my understanding of what Judge Timkovich said, that there was testimony, expert testimony, that there was a hydrologic pathway for water to get from the pond to the river. I respectfully disagree. I think you're mixing apples and oranges on this. In terms of, Ms. Johnson's testimony wasn't about a pathway. Hers was a hypothetical calculation of time. We don't even know the pathway. And so it was Mr. Shirl's, it wasn't even a pathway. His testing, he talked about anomaly A near the top of the embankment around Pond 3. It's actually above the water level. I don't know how water can get conveyed from above a pond and then to a river that's approximately 70 or 100 feet below. And it was similar for his anomaly for Pond 4. He conceded. His testing couldn't even go deep enough to get from the surface, where he did his testing, all the way down to the bottom. It's different from like in the Maui case, for example. They pumped four million gallons of ethylene into this pond. And the testing demonstrated that there was an underground aquifer. And it was uncontested that four million gallons, all of it, would eventually make its way to the river. But they also had to prove that the pollutant was there. And so they did a dye trace study. And they could figure out where the water came out in the ocean. And they could test that. And they were concerned in that case about nitrogen. And they could test that nitrogen. And they knew it was being added to the ocean in that case. There's no evidence like that here. Again, what we basically had is the fairly traceable case. There seems to be some difference back and forth between whether there's water that gets into the groundwater and whether a pollutant rides along the water to the river. And I want to focus on pollutant because I'm looking at the district court's order. And he has a section 3 called pollutants. And he relies on the Arrakis. Is that how you say that? Yes. Arrakis study. And he interprets that to show that based on water samples, that there were pollutants that were, I guess, at a higher level. These chemicals were at a higher level below the mine. And the conclusion from that is that the higher elevations were introduced through seepage into the groundwater than under Maui into the river. So what's the fundamental flaw in the court's order on that piece? What you're talking about there is that's the fairly traceable test. So, okay, we have a pollutant in a pond and we have the same pollutant in the river. That has to be the case here. The way this mine operates is it takes the dirt from the river floodplain and it washes it with river water. That's all this mine is. So what's the flaw in Judge Martinez's reliance on that Arrakis test or study? I think if you go and you look at the Judgment Paragraph 199, and I like to read that for you because it ties into two of the Maui factors that the judge couldn't even consider. He said, Plaintiffs failed to introduce evidence of precisely how much polluted water was discharged from the settling ponds into the middle port, nor did plaintiffs introduce evidence of precisely what concentration of pollutants the discharged water had when it reached the middle port. And so he disregarded and he couldn't consider elements from the Maui case, factors 5, 6, and 7. And you have to be able to determine, again, was the pollutant added or was it there before? And these pollutants are always going to be in the water. These are the exact same things in the water that you find on a mine. And it's important. It's even more critical in a case like this to apply those Maui factors because the court has to conclude or has to have the evidence to conclude that there was a discharge, the addition of a pollutant to the river. What was the paragraph number from the opinion you referred to? 199. And your honors, I show that I'm out of time. You've taken most of the time of Amicus, actually. Go ahead. That's probably the best way to do it. May it please the court. Gabe Brax, representing the Amici Colorado Mining Association and the Colorado Stone, Sand, and Gravel Association. The concerns of the CMA and the CSSGA are that mine and sand and gravel operators in Colorado rely on the statutes, regulations, and written policies of state agencies, including the water quality regulations of the Water Quality Control Division and the Division of Reclamation, Mining, and Safety. They also rely on the Supreme Court precedent in Maui that says that only the functional equivalent of a discharge of pollutants from a point source to waters of the U.S. requires an NPDES permit based on the consideration of multiple factors. None of this allows for the creation, as the district court did, of a rebuttable presumption that was used in this case. In addition, this case is significant because it's the first case in which a circuit court is being asked to apply the Maui factors to determine whether an NPDES permit is required under the Clean Water Act. The rebuttable presumption you're talking about is that if you're close enough to the river, then it polluted the river, essentially. Yes, Your Honor. And the plaintiffs say that was not adopted as a presumption by the district court, but just something that was additional support for the conclusion shown by the evidence. Your Honor, the district court, in the opinion, did say that the rebuttable presumption existed and that that was corroboration of the district court's opinion. But it was an error of state law application. And what the Supreme Court said in Maui is that the courts have to be sensitive to or recognize the historical responsibility of the states in regulating groundwater quality and non-point sources. And what the district court did was to create a nonexistent rebuttal presumption here, which then resulted in findings that the court was just discussing, in which the district court said that there were no facts on several of the factors. And therefore, had the defendant come up with evidence on those factors, that the court would have considered them. But because there was no evidence on those factors, those factors were not given any weight, as opposed to a determination that under the facts of the case, those factors were not applicable or were not relevant for the determination. Well, you quoted it right, which is the court's conclusion is further buttressed by, and then it gets into that. And it's five lines of text. So it's not like the district court glommed onto that rebuttable presumption and said, therefore, I rule. It's just adding something that I heard at the trial, it sounds like to me. Well, Your Honor, in fact, there is no such rebuttable presumption in state law. And therefore, there was no corroboration of that approach that the district court was taking. There was no written policy. And in fact, the testimony of the state witness stated that there was no written policy of the state applying a rebuttable presumption. There was a practice, though. It wasn't a regulation. It wasn't a policy. It wasn't a statute. But this didn't come out of nowhere. Your Honor, the testimony of the witness was actually that the state had not considered or applied any practice when it comes to permitting for mines. And that there was a distinction made between permitting for facilities that were under the jurisdiction of the Water Quality Control Division anyway, as opposed to mines where state law establishes a different structure where the DRMS is the primary regulatory agency, including having responsibility for protection of water quality. You're out of time. Your Honor, I am. I'm curious what the specific point that you wanted to make as advocates was. Can you state it in a sentence or two or a few seconds? Really, again, starting with Maui. The Maui case, the Supreme Court said that the decisions should not create a risk of undermining state regulation of groundwater and non-point sources. And that the district court did that through the misapplication and really creation of a rule that doesn't exist in Colorado. I got that. Thank you. Thank you, Your Honor. Good afternoon, Your Honors. Randall Weiner, counsel for the plaintiffs and appellees in this case. The two most critical and undisputed facts in this case are that the settling ponds are located less than 100 feet from the South Platte River. And second, the defendant stores its mining, wash water waste, industrial waste in unlined settling ponds up gradient, up the ground, and 20 feet above the South Platte River. Now, one of you mentioned that Judge Martinez had a thorough opinion, and he did. This was a very thorough analysis of the facts. And basically, you're deciding whether or not the clear error was involved by Judge Martinez. His decision on the major issue, which was whether there was a discharge of a pollutant, was predicated on a three-legged stool. The first leg was the history of permitting, which characterized what the operations were, what went on at the site. And that characterization showed that these ponds were designed to discharge into the ground, to seep into the ground. Otherwise, as our expert said, they would have a real problem. The second leg of the stool was the sampling, the testing that our geophysical testing expert did. I think I have time for a quick story. He was a—right before he went on the stand, he said, the last time I was in these federal buildings was when I did seismic studies to see if they would withstand an earthquake. So Judge Martinez's first question to him on the stand was, are we safe? And the answer was, yes, we're safe. But he was a blue-ribbon expert who was actually doing sampling and testing to see if their theory held water. Do these bowls leak, right? And if they leak, is there a pathway out of them? And Phil Searles, Collier's geophysical, did that testing in comparison to the zero testing that the defendants did in this case. They never lowered the level of the ponds to see— The burden's on the plaintiff. The burden was on the plaintiff. But at some point, Your Honor, when we come forward with sufficient evidence, they need some explanation for why common sense and all of our testing and all of the history of permitting is somehow wrong. And we had a four-day trial where they never posited a single molecule of evidence that suggested that there was something underneath Ponds 3 and 4 that was different than the rest of the site, which is in alluvial groundwater, right? So that when water, as their expert admitted, goes into the ground, where is it going to go? It's going to go into the South Platte River. Is it going to go anywhere else? I asked the expert at A3744—sorry, 3876, and he says, no, I agree with that. At some point, they have to say, okay, underneath these ponds, there's a barrier. Underneath these ponds, there's a cement liner. Before we get to their burden, I want to focus on your burden. And you were saying that there were three— Legs to the store. Yes. And had you finished all three? I hadn't. I didn't think so, so go ahead and get those. Thank you for focusing me, Your Honor. The third leg of the stool was the testimony at trial. All of the experts that we put on, we had a hydrogeologist, we had a geologist, we had the head of the state's permitting program. We even had a concession from their expert about how water that goes into the ground is going to make it to the river. All of the experts opined that there was a discharge, that these ponds—their expert didn't think but this—but that these ponds leak because there's no liner. There's no—that's what our collier geophysical, Phil Searles, found out. There's no liner, and the water will get into the groundwater because it's in the alluvium, and it's so close. Do you know you can go up to the embankment of the ponds and look down at the river? There's a great picture. That sounds like—you have to show more than just seepage. You have to show that a pollutant migrated from the pond to the river, right? I think it's a two-step process. You're right. I think we have to show pollutants, and then we have to show a discharge. No, you have to show an introduction of the pollutant to the river. It's true, but if we have a discharge and all we have is polluted water, unlike in your El Paso case where we were looking at just the manganese and zinc constituents, here the judge found that the entire body of water was polluted. You don't look at the constituents at that point. You have an industrial waste. Yes, Your Honor. You're nodding your head. Yes. I think I'm about where Judge Timkovich is on this. Sure. It seems to me that this is not just sufficiency of the evidence. It seems to me there's a legal issue here. Maui opinion gave a number of factors, only three of which were addressed by the district court. And what's different about several of the other factors that were not addressed is they addressed the issue of pollutants. What we have here is water gets out of the pond, seeps in. I can't remember what infiltrates from the pond. Percolates. Percolates, okay. And water gets from the ground to the river. Nothing shows, I don't know of any evidence produced, if you can correct me on this, that shows that any of the pollutants also got out of the pond. You have clay at the bottom. It's permeable. The water can get through. Maybe it filters the pollutants. The only evidence you have regarding pollution of the stream is contrary to your theory. And that was the evidence that at this pump station by the pond, the level of pollution in the water was the same as it was above the pond. That's a remarkable fact that wasn't dealt with. And it makes much more credible the possibility that there's filtration of the pollutants out of the pond water so that the water that gets through, that percolates through, is not polluted. I don't know whether it is or not, but we don't have any evidence of that. And it's your burden. They don't have to prove that. You could say that any ground always filters out the water. Then don't you have to show that the pollution below the pond and the stream, downstream of the pond, is greater? In Maui, the three factors would have been adequate because there's no question about the pollution. The stream was polluted below whatever. There's no question here. What's the evidence? There's greater pollution below the stream, below the pond, and above. Yes, you'll have time. I'll always give you time. Okay, great. To prove me wrong. This hinges on the statutory definition of pollutant found in the Clean Water Act, 33 U.S.C. section 32.6, I believe. It could have been 4. The definition of pollutant is an industrial waste. It was admitted at trial that this mining wash water waste that circulates from Ponds 1 to 2 to 3 to 4 to the facility to back again, over and over again, is an industrial waste. Okay. The reason it's different. You proved that for sure. It's the same as in Maui in that we have a polluted source of water. By definition, it's polluted. Okay. Right? So if that polluted water, even the molecule he used, gets into the river, it's the addition of a pollutant. You're assuming, though, that it reaches the river. I'm sorry? You're assuming that it migrates from the pond to the river. Sure. Now, that's a factual issue. We have to prove. What's the evidence of that? That was the three-legged stool. The fact that when you have a discharge into the alluvial groundwater 100 feet from the river. That's an assumption. That's not proof. Right. That's pretty logical. I'll spot you. Sure. The sky is blue at some point when you're that close to a river. But nonetheless, we had our hydrogeologist, Carla Johnson, walk around the site, move cobbles. Can I stop you there? Yes, sir. I credit her testimony on the hydrology piece here. Yes, you did. But when I picked up the case, I'm kicking around in chambers, I thought, okay, we're going to get a water quality test above the mine. We're going to get water quality tests at the pump house. And we're going to get a water quality test below the mine. And you'll look at that testing, and it'll show elevated pollutants below the mine. Therefore, it's probably from the mine. They've tried to show it might have come from the highway or from the city. But right below the pond, I would expect to see a study that analyzed the water right there. And we don't have that here, do we? No, because there's a lot of dilution going on in a river. And fortunately, the Clean Water Act and all the case laws— A lot of it's natural, too. I'm sorry? A lot of these chemicals or elements are in the river naturally. They are, but you don't have to prove that the river's been impacted under the Clean Water Act. Sure, you do. You don't. The issue isn't discharge of water into a navigable stream. It's the discharge of pollutants. And we have— No, you don't. You have no evidence of any pollutant. Correct me. I'm wrong. Read section. Yes, sir. All the testimony shows is that water that seeps out of the pond can enter the river. And I may be more willing to accept that testimony than Judge Dimkovich. Maybe I'm wrong about that. But even if you have that, the other factors in the Maui test go to whether there's pollutants that are being discharged in the navigable water— Your Honor, let's use a Kool-Aid test. Let's say that Ponds 3 and 4 were completely filled with Kool-Aid. Okay. If that Kool-Aid, even a little bit of it, gets into the South Platte River, they need a permit, or they at least need to apply for a permit. And this is what we have here. We have an industrial waste. It's the Kool-Aid. It doesn't matter if a constituent in the Kool-Aid is found in higher levels of the river. That's not the way the Clean Water Act works. You don't have to prove that you're polluting the water. You need to prove the addition of a pollutant. So where you have a Kool-Aid and you're putting it in the river, you have, by definition, the addition of a pollutant. Where's the evidence that the water that seeps through the bottom of the pond, gets through the clay, is polluted? Where's the evidence? It would be—it's a level of— If it's really small under Maui, then it's not a discharge. It's a level of precision that is neither reasonable nor practical. To require somebody, any, you know, all the state agencies have been doing this now for 20 years, to make them go out and show that the pollution that's getting into the river is changing the river somehow. That's not how the Clean Water Act works. You know, the Clean Water Act doesn't prohibit pollution. You don't think it's remarkable that the level of pollution below the ponds is the same as above the ponds? That doesn't strike you as a striking fact? No. The striking fact for me is that the level of pollution in the ponds is greater than the river, because it shows that you are adding pollution to the river, not that it's reflected. You know, do you think— Well, if it's adding pollution to the river— In Maui, they didn't require that the ocean— That's because it was undisputed. Right? It was undisputed. Well, no, but you couldn't. The ocean is not going to reflect. It was undisputed that pollution was leaving this source there. That was not an issue in Maui. It shouldn't be an issue here, either. So— Because we have an industrial pollutant by definition in those ponds, and if it gets into the river, a permit is needed. Okay, and how do we know it gets into the river? That's what the other Maui factors require you to show. You know, my co-counsel will be addressing the Maui factors, but I can tell you this. First, the way enforcement should work is we need to show the discharge of a pollutant from a point source into a water of the U.S. when they don't have a permit. I agree. After that's done, you see, do you have the equivalent of a direct discharge, the functional equivalent of a direct discharge? The question I'm not sure that you have focused on is, you could have Kool-Aid in the pond and water in the river, which is to say black cherry and the sugar and everything else that rotted my teeth, that that never made it to the river. That's what's being asked, I think. Does the Arrakis, does that help you? The Arrakis? The Arrakis, Inc., the Murray, as far as more pollutants at Pond 4 than at either diversion point. You know, I think that the fact that you have a pollutant that's higher in those four constituents, potassium and calcium and magnesium and sodium, when you have a thick Kool-Aid, but by the time it hits your stomach, you don't get gas, that you still have to get a permit to put that Kool-Aid in your body. You still have a polluted source, and by definition, I know I'm repeating myself, under Section 1362, by definition we have a polluted water in the ponds. That's what these folks do. They create settling ponds to hold their polluted water. So if we can show they're leaking, and if we can show that they're getting into the alluvium 100 feet away, so close that you can almost spit in it, then you know darn well that that polluted water is getting into the river, and the case law does not require that you show that the river is impacted. That would make permitting, that would truly change the way the Clean Water Act works. Let me ask a question about the, you mentioned some of the chemicals that are polluting. Yes. It's not just the bare element. These are compounds with potassium in them. Is that right? Do you know what the compounds are? Are they big molecules, little molecules? Do we know? I don't. I know they're cations, and essentially they affect the salinity of the river. Maybe not in a way that's measurable. And again, I don't think you want to make all of us citizen suit folks and the Water Quality Control Division go to each water body and measure and make sure that that pollution is impacting the river. The case law across the country does not support that interpretation. But if there is a pollutant from a dirty pond that makes it to the river, then they need to apply for a permit, which they should have done from the get-go. I'm sorry, Tom, I have a couple of questions. To follow up on that, in looking at the record here, I asked about where the water quality test was, and the only place I could find it in the record was in the Purcell report, which wasn't admitted. Is there some other comparable evidence of water quality that would show some additional pollutant made it to the river? You know, the Arrakis results, you know, that was their agent. Their agent went and in their report said, we're going to study water entering and leaving the mine site. And so then they analyzed a couple of culverts that were down in the southern end of the mine site. The judge ruled against us on the culvert discharge, but nonetheless, that sampling done by Arrakis is probably worth a second review to see if the level of those cations was higher down in that southern part of the mine. That would be a place where you could look for that. So that's the best and only evidence on water quality? Right, because we don't believe the Clean Water Act requires that you demonstrate that water quality is impacted in a receiving water. Okay, so if I can unpack that. Basically, there's a presumption that pollutants reach the river if you can show that there's a hydrologic connection between the pond and the river. I would agree with that. And it doesn't that tie into the CMA's rebuttable presumption point? That's an affirmative element of MAUI that you have to show. You know, again, the United States will address that, but the MAUI factors are suggestions to be applied in particular circumstances. Not all of them have to be hit. Here we had three of the MAUI factors addressed, time, distance, and the materials through which things went through. The fourth one is the amount of pollution, I'm sorry, the extent to which the pollutant is diluted or chemically changed as it travels. Why would you even ask that question given your theory of liability? That would be totally irrelevant for your theory of liability. Once again, the MAUI factors are suggestions that can be interchanged for a particular circumstance. I don't think that's a question that needs to be answered in order for us to find the functional equivalent of a direct discharge with such a short distance. Remember what they said in MAUI. We're not going to require a permit if the source is many miles away or is, you remember that, right? Many miles and many years distance for the water to travel. Here we have a really common sense close area, and I think that that is something the court should keep in the forefront of their mind that we have settling ponds so close to a receiving water. Yes? I've got another question coming. Yeah, and my final question, I just wanted you to respond to Mr. McMahon's point about paragraph 199 of the order where the district court said that the plaintiffs introduced or failed to introduce evidence of precisely how much polluted water was discharged from the settling ponds into the middle fork, nor did the plaintiffs introduce evidence of precisely what concentration of pollutants the discharged water had when it reached the middle fork. I just wondered if you could give me your interpretation. I do. So the judge was going through the statutory factors necessary when it imposes some kind of a permit on a polluter, and that's one of the factors that the court has to look at. It has nothing to do with either the Maui factors or the question of whether you have polluted water that gets into a stream, which I know you're looking at. And the judge basically said, look, we can't find a specific way that something is injured in the river, so we're not going to make the penalty as high. We're only going to penalize them for a half a million, the avoided cost of putting a liner in. We're not going to ding them for harming millions of fish. So that's what that paragraph 199 was talking about. Thank you. Thank you very much. One direct, I think pretty direct question. There's a difference between Ponds 3 and 4 and 1 and 2, right? All the testing is on 3 and 4. I'm sorry? The testing that's done is on Ponds 3 and 4. That's right. The anomalies relate to those ponds. And yet there was penalty imposed for 1 or 2. Is there sufficient evidence of that? Yeah, because there really was no question as to whether Ponds 1 and 2 were leaking. Right? The whole issue was whether, and that's the whole focus of the case was, is there enough clay, that was their only defense, is there enough clay at the bottom of the pond so that they don't leak? It's not a leaky bowl. 1 and 2, there's no question. They leak. Okay. Thank you, Jeff. Thank you, Your Honor. Good afternoon. May it please the Court, David Galtieri of the United States, on behalf of the United States amicus curiae here. The Court has a lot of questions, a lot of very good questions. If you don't mind, I'd like to hit rapid fire a couple of points that have been raised on the point that the United States primarily is here to speak about, which is something very important to us, and we have an interest on both sides of this. We are an enforcer, and we are also, we have federal facilities that need NPDES permits that could be the subject of citizen suits just like this. So this is a very important issue to us that the Court, in this matter of first impression, have an opportunity to interpret Maui correctly and to apply Maui correctly in this case if the Court reaches it. I'm sorry. I have to interrupt. Why is this a matter of first impression? Aren't we just applying Maui? Well, the application of Maui by an appellate court of the United States, you will be the first court to address the substance of that decision and how it should be applied. And so it's important to us that we provide whatever views we can to be helpful to make that application correct. I want to hit one point very quickly on the discussion of Judge Timkovich's question about Paragraph 199 in the opinion. I would direct the Court to Paragraph 149 of the decision, that's at A4278, which is Judge Martinez's discussion of what the pollutant is here. And that's where he says the industrial waste is the statutory pollutant. And he cites a case, a Northern Plains case from the Ninth Circuit. In that case, the pollutant was also industrial waste. And it was also unaltered groundwater that had been pumped up as part of an industrial process. And the Court said, look, whatever's in it, it's a pollutant. It's a statutory pollutant. We're tracing that water very different than El Paso where we're looking for specific constituents. So in some ways, the Arrakis testing, you know, there's a little bit of a diversion here with those four compounds. Those are constituents that are in the statutory pollutant. If there were a spike in them or if there was something that tells us something about what's in the water, that would surely be additional evidence. But it's not required by the Clean Water Act. The Clean Water Act has a strict prohibition of a discharge of a pollutant from a point source to inalienable water. The plaintiffs don't get an advantage of a presumption that the pollutant reaches the river. They've got to prove that. That's absolutely right. And how did they prove that here? Well, here I think, and this is another point I wanted to make, and Ms. Frink may have seen setting here and talking about Maui and the Sackett decision and scaling back the federal jurisdiction of the Clean Water Act and the scope of the Clean Water Act. There's a lot of conflation of what's going on with the Maui decision and this first step that you just described. It's a two-step dance, right? We first have to have a discharge of a pollutant, which is any addition of any pollutant. That needs to be shown. That's basically even referred to as a hydrological connection, Judge Tinkovich. That's correct. We have to have that first. That gets the water there. Right. That has to happen first, right? So that is the Clean Water Act, you know, trigger for the Clean Water Act. Maui is not about whether there's an addition or a burden of proof. Maui doesn't have a burden of proof element to it. Maui is asking what is the nature, what are the characteristics of this discharge in a situation when it goes through groundwater? Is it roughly similar? Is it similar enough to a direct discharge that the Clean Water Act should appropriately apply to that because it went through groundwater? And there the court listed seven illustrative factors, seven things that could be relevant. The court went to great pains to say this is very complicated. There could be many different factors. These are some of them. They're merely illustrative. None are mandatory. There's certainly no requirement that all seven be applied in every case. Don't you think that those seven factors, though, when you look at them, they emphasize the need for showing not just that but also that the pollutant gets in? Well, yes. So it's a little bit of a complexity here because the water, we're calling it the water, it's industrial waste. It's industrial pollution. There are four ponds designed to capture as much of it as they can and hold it. That's the statutory pollutant here. So that is the pollutant in this case. Well, but we don't know. There's nothing to show the quality of the water that permeates the clay at the bottom of ponds three and four. We have no evidence that, you know, maybe they're filtered out. I don't know. Maybe that's a very stupid thing to say and any chemist would say, of course they're not filtered out. It is not at all. I don't know. Well, I can take it. Rest assured it is not. It is a very good question and it makes a lot of sense because usually we're talking about things like arsenic and pollutants and things we're worried about, right? Here, the thing we're worried about is the result of industrial processes that wind up in a pond accumulating through a series of things and aggregating, right? But the Clean Water Act doesn't demand that we track with precision the constituents that make up that industrial waste. Congress, in its judgment, said it's industrial waste. You have a permit for it or you don't discharge it, period. That's what the Clean Water Act says. We don't need to thin slice it and slice and dice it to see what was in it. So if any of that water made it from A to B, you have a discharge of a pollutant to an available water without a permit. And there's no de minimis test? There is not a de minimis test and it's a strict liability statute. That's the logic of the statute. I'm sorry, Your Honor. I want to make sure I'm understanding you because this surprises me. You're saying that because the groundwater under the pond originated in the pond, then there's no need to show that that groundwater has any of those pollutants in it? No. Again, that's why I call this sort of a rachis table because the court included the distraction with the particular compound. Those are constituents of the statutory pollutant that is regulated and cannot be discharged without a permit. Now, if by some magic it disappeared, if there was a theory that the water that we know is coming through these ponds and only needed to go 100 feet through super permeable material downhill in the alluvium, if there were some rebuttal, if they rebutted it by saying it just doesn't, it disappears, it goes away, it evaporates. Maybe I was not clear. I'm not talking about a change in the water once it's groundwater and takes the 100 feet or whatever it is to the river. I'm talking about the polluted water in Ponds 3 and 4, clearly polluted. How do we know that what seeps through the bottom of the pond is also polluted? And you seem to be saying, I know counsel is saying, that that's irrelevant to whether there's a violation of the Clean Water Act. In other words, even if it was totally filtered or 99.9% filtered or whatever, that there would still be a violation of the Clean Water Act? I hear what you're saying now, and I appreciate you clarifying that for me, Your Honor. Technically, it would not matter. We have a statutory scheme here. The statutory definition is industrial waste. That is what they conceded the stuff in the head ponds is. That is what the court found. And unless there was some contrary evidence submitted that we basically had the equivalent of distilled water by the time it got to the bottom of the ponds, which is what you're positing, which would defy any mode of science or anything that I think anyone's familiar with, and there certainly has been no argument or suggestion that the chemistry has changed. And if I may, Your Honor, this brings me to your other point. You asked about the other Maui factors, and there are four others. The Supreme Court provided tremendously helpful guidance in the decision by giving us goal posts. On one end of the range, the court says, look, if you're a few yards or a few feet away from an avalible water, you pulled your pipe back, it goes into the ground, goes into the groundwater, and shoots out into the navigable water. The permitting requirement clearly applies. On the other hand, on the other goal post, we have a situation where it's 50 miles away and it takes many years. And the court even gave another example of it's 250 miles away and takes 100 years. There the court didn't say it doesn't apply. I'd like to correct my counsel on that point. What the court said is it's less likely to apply. They didn't even rule out that situation. But the difference is when you're close, the court went to pains to say this, and Justice Kavanaugh in his concurrence noted it as well, time and distance are going to be probably enough. The court was concerned that we have a practical, a flexible, and administrable test that permitting agencies and permittees can deal with. When you're 100 feet away and it's going through an alluvium of super porous materials downhill, do we really need to evaluate what's going on in between? In Maui there was a dye test, wasn't there? There was. And from what I've just heard, like the simplest piece of evidence to generate here would be a dye test because it's going to zip through the alluvium like food through a goose. Well, that's a very good question. So let me give you two different responses to that. And I very much appreciate the court's indulgence. I see that well over my time. In Maui we had a facility that was a half mile away in a very complex hydrological regime where it was traveling through and emptying out into the Pacific Ocean on beach fronts and different areas. It was a very complicated setting and a massive case with millions of gallons a day. It was a huge, couldn't have been a bigger deal, right? So a dye test seems reasonable, right, to study that and to know for sure. That's not what we have here. Here we have 100 feet that we need to travel. The Supreme Court was well aware when it wrote the Maui decision of what had happened in Maui that they did use a dye test. But they didn't say anything about a requirement for a dye test. There was no suggestion whatsoever of any mode of analysis. They basically said easy cases, time and distance is probably going to do it. And your second, here are two questions if you don't mind. The second question was sort of why not do it here. One, it just doesn't seem to warrant it. This is a very, very simple geology and simple physical setting. But my understanding is you would have basically had to create a settling pond full of Kool-Aid to do it. The practicality of doing it was a challenge and so it wasn't done. That's not in the record, that's not discussed, but that's my understanding. You've got a budget to try to prove the case and some tests aren't working. It would seem overkill in this situation. The Supreme Court gave the latitude to say, look, in the easy case, time and distance is usually going to do it. We've got two days, we've got 100 feet. 100 feet is the distance an NFL extra point flies, right? You can see it from the top. Wouldn't a water quality study have disclosed that pretty readily? Honestly, no, and I'm going to be going... I know, I don't want you to go after your colleague. Here we are dealing with the types of compounds, as you noted, that are common. They exist, they matter. They affect the chemical, physical, and biological integrity of the waters, which is why Congress wanted to control what gets in there, right? But at the rates that they're likely coming in and seeping through into the river, and the amount of dilution and other sources of things that's common in the river, the odds of seeing a spike... It's not like the pond burst and it had an exotic contaminant in it and we see a spike. I suppose it's not the law, but if the water quality is 1.0 bad above the mine and it's 1.0 bad below the mine, maybe there's been a statutory violation, but A, how do we know, and B, does it matter? Right, again, do I wish that were the case here? Do I wish we had that study and I could give you those numbers and it would be like, that's a slam dunk? That would be great. But the Clean Water Act doesn't require that. In fact, when Congress wrote the Clean Water Act, the previous version of it did rely on states and a mechanism of proving that it was the pollutant that got in there and all that. It was very cumbersome and complicated and super hard to prove. And what did they do? They established a system that said we are going to eliminate discharges to waters. If you don't have a permit, you can't discharge, period. Easy. And that's what we have. And so here, despite the challenge that Judge Hartz noted of, you know, is it just the waters that we're worried about? But that's what we got and that's how the statute works. Let me give you an example close to home, literally. Rio Rancho, New Mexico, has a huge Intel plant. It uses a tremendous amount of water and it pollutes it tremendously with the chemicals they use. They're trying to be a very good citizen and they clean that water as much as they can and introduce it into the Rio Grande, which is the source of water, drinking water downstream. No matter how much they clean that water, maybe they turn it into distilled water. That's industrial pollutant, as you interpret the statute. Categorically, yes. I mean, I think we are in the legal territory of categorical application of statutory terms and it is what it is. The Northern Plains case that Judge Martinez cited in describing what we're tracking in this case, that was unaltered groundwater that got pumped up and then got used for an industrial purpose. It started meeting all the definitions and bang, there it is, and they were discharging it without a permit and that was a problem. Definitionally, you're in. It's an in and out situation. I guess I can make just one other point about the idea that the Maui decision scaled back Clean Water Act, the scope of the Clean Water Act or the authority of the Clean Water Act. It did nothing of the kind. The Clean Water Act has applied to discharges that travel through groundwater for decades. EPA has been issuing permits. Meg Parrish from the Water Quality Control Division testified to the fact they've been doing it since the 90s. They do do it at mine sites, actually, in some of her testimony. She talked about the fact that we have to tap dance around that a little bit. We've got another agency to deal with, but this is the matter of you can need two permits from two different agencies for similar activities. It just is what it is and they're working through that. What the Maui decision did was it absolutely confirmed 100% to the extent anybody was arguing that the Clean Water Act doesn't touch discharges if they go through groundwater first. Maui said, oh, it absolutely does. When does it? When there's a functionally equivalent discharge that is roughly similar to what a direct discharge would be, using these illustrative factors or maybe others to make that determination. It didn't change a thing. In fact, EPA had probably a narrower scope of when it was applying permitting to a groundwater situation.  The Sackett decision was mentioned, which is indeed a Clean Water Act decision from the Supreme Court that came down recently. It has absolutely zero applicability to this case. I'm happy to talk about why, but it's not cited in the briefs. It hasn't been raised as part of an argument and there's no 28-J letter. Sackett came out well before this argument and we haven't seen any supplemental authority notice. It's just not in this case. You've been very generous with your time. Did you have a question? You have been generous. I'm done. Do you have any questions? Thank you. I'm going to give you six minutes as we vote. Before you start this time, what I'm very interested in is do you agree with Amicus, opposing Amicus, that if water from that pond enters a navigable stream, then that's industrial waste and it's a violation of clean water? I think that it could be, yes. But there's no proof that that happened here. And that's the problem. We keep hearing things like football fields and goal posts. But what they're hiding is that there's no evidence that even water, again, the expert conceded, there's no evidence that even a molecule of water entered the river. So again, even if they want to talk about, okay, we're close, there's no evidence that it happened. It's not a Clean Water Act violation for water to infiltrate into the ground. It would have to be added to the river. And what they are missing is that there's no evidence for what's happening underground. They want the court to assume 100 feet. Oh, it's 100 feet. That's it. To focus our attention, you agree that if we find there was sufficient evidence that water from the pond entered the river, that that would be a violation. Because it's industrial waste, no matter how it might have been filtered by the clay at the bottom of the pond, and even if the level of pollution downstream from the ponds was no higher than above. You would agree that that would be a violation? No, under Maui, I would. Sorry, I didn't understand that that was the distinction that you're making. Because what you have to find is the water. So we're talking about the industrial waste, right? And maybe I don't understand your question, but let me explain and we might get there. You didn't explain it well, but go ahead. Okay, so what we have to show is that water. Okay, we're talking about Kool-Aid. We can talk about Kool-Aid. We have to show that the Kool-Aid actually made it to the river. And if we can show the Kool-Aid made it to the river, sure, yeah, Clean Water Act violation. Well, when you say the Kool-Aid, what if the pollutants, the potassium, the other minerals, were filtered out in the clay at the bottom of the pond? So it's Kool-Aid without the sugar and the coloring. Would you agree that because that's still industrial waste, that would be a violation of the Clean Water Act? It could be, but those aren't the facts. Okay, no, no, no. Okay. If those were the facts, do you agree that that would be a violation? If those were the facts, yes. Okay. But according to Maui, we need to understand what's happening because what that waste could turn into in the ground, as you've noticed, the allegation is it goes through groundwater. Okay? So the groundwater itself getting to the river wouldn't be a Clean Water Act violation, right? So we have to show that the mixture, the Kool-Aid, went into the groundwater, and then it was conveyed through the groundwater into the river. Here, again, they keep talking about 100 feet, but there's no evidence. Where does water allegedly enter into the river? There's no evidence of that. How much water actually ever entered the river? There's no evidence of any of that. And so what we're doing, again, is we're flipping Maui on its head. No longer do plaintiffs have to prove this. Instead, they can just do drive-by water sampling one day. They can wait a couple of years, three years here, to file a lawsuit based off of one set of sampling and say, well, geez, there's water infiltrating into the ground. That's pretty close to the river, so we have to assume there's a Clean Water Act violation here. That's just not right. And the United States position is perplexing to me. In the Maui case, it was the United States position that there would be no Clean Water Act violation. No permit is required for a discharge to groundwater. That was the United States position in Maui. And here we have the EPA a couple of years later saying, well, gosh, not only is that wrong, but now we have to have even greater expanded Clean Water Act permitting requirements where a plaintiff can't meet their burden of proof. We have this thin kind of record. There's this massive liability. That's just not what the Clean Water Act, and that's certainly not what the Maui case says. But Judge Phillips also asked some really good questions. We have Ponds 1 and 2. There's no evidence regarding Ponds 1 and 2. If any water ever left Ponds 1 and 2 through groundwater, there's no evidence of any of that. So at a minimum, we have to reverse the district court regarding any liability for Ponds 1 and 2. And we've talked about almost exclusively liability today and not the penalty. I know Judge Phillips asked that, so I just wanted to mention that. What the Supreme Court mentioned was if the regulators have a reasonable, they made reasonable efforts to comply with the law or they reasonably believe they didn't need a permit, then we shouldn't require them to get a permit. We shouldn't penalize them here. What the facts are here is when this lawsuit was filed, again, in the Maui case, we know what the United States position was. No permit would ever be necessary for a case like this. That was the position of the United States. We know what the state of Colorado's position was when this lawsuit was filed. No permit's necessary to do a discharge to groundwater because that's what the permit said here. And so High Mountain believed it was complying with all laws when this lawsuit was filed. As a matter of fact, just months before the lawsuit was filed, there was a study done by two Colorado agencies about mercury. An anonymous person claimed there was mercury at the mine and it was getting into the river, right? And they conducted a study on that and they sent a letter to High Mountain just months before this lawsuit was filed and said, High Mountain, your operation is in full compliance with all state and federal water regulations. That's what High Mountain understood when this lawsuit was filed. So all of this is surprise liability and it just doesn't make much sense and we need to make sense of it. I know you don't want to give advice to counsel, but how should plaintiffs have proven that the molecule of water reached the river? I think it would be pretty easy. What we've heard is there's tons of water going through this and there's a water problem. If it's only 100 feet from the river, we should be able to see this massive amount of water going into the river. All you'd have to do is set up a measuring station right there. Is it going to show the water coming in? The river's public right next to the mine. You could sample it every day of the week for your entire life if you wanted to do that. They never did any of that. As you noted, Judge Stimkevich, the only evidence of measurements in the river is from one day in 2016 by the Arrakis entity. It would be easy to prepare and create the evidence to support the case here, and they just never did that. Again, it just demonstrates they didn't satisfy their burden of proof. Thank you, counsel. Thank you. Another tough case. Thank you, counsel. Case is submitted.